# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 20-1348V

| | |
|---|---|
| JAVIER O. SALAZAR,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: January 31, 2024 |

*Joseph Michael Russell, Von Briesen & Roper, S.C., Milwaukee, WI, for Petitioner.*

*Mitchell Jones, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM[1]

On October 9, 2020, Javier O. Salazar filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on November 8, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons discussed below, I find that record evidence preponderantly establishes that the November 8, 2017 flu vaccine was administered in Petitioner's left

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

deltoid, but that Petitioner's Table SIRVA claim must be dismissed for failure to establish that the onset of his symptoms occurred within 48 hours of vaccine administration. The parties will be allowed a brief period to attempt informal resolution of Petitioner's causation in fact claim, before the matter is transferred out of SPU.

## I. Relevant Procedural History

A year after the case was activated, Respondent stated that he was amenable to informal resolution (ECF No. 31). Three months later, however, Respondent changed his position, noting the intent to file his Rule 4(c) Report (ECF No. 37). The parties subsequently agreed to brief the question of Petitioner's entitlement to compensation (ECF No. 41).

Petitioner filed a motion for a ruling on the record on November 9, 2022 (ECF No. 46). Respondent responded on January 9, 2023 (ECF No. 48), and Petitioner replied on January 17, 2023 (ECF No. 49). The matters of the situs of vaccine administration and whether the onset of Petitioner's symptoms occurred within 48 hours of vaccination are now ripe for consideration.

## II. Issue

At issue is whether (a) Petitioner received the vaccination alleged as causal in his injured left arm, and (b) Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours, as required by the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a) XIV.B. (2017) (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

## III. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

2

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical

records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV. Findings of Fact

This ruling contains only a brief overview of facts relating to the situs of vaccine administration and the onset of Petitioner's symptoms.

### A. Relevant Factual History

#### 1. Medical Records

On November 8, 2017, Petitioner received a flu vaccine at the Waupun Correctional Institution, where he was incarcerated. Ex. 1 at 383, 385-86. The vaccine record contained in the certified records from the Wisconsin Department of Corrections does not document the situs of vaccine administration, i.e., in which arm the vaccine was injected. *Id*. Petitioner later filed a document with no patient name reporting that a flu vaccine was administered in the left deltoid. Ex. 15 at 2. The document is signed by a nurse and lists a vaccine administration date of November *9*, 2017, one day after Petitioner's flu vaccination. *Id*. Petitioner's counsel filed an affidavit stating that this document is the second page of Petitioner's vaccine administration, and that Petitioner had told counsel that he "recently discovered this document among the files obtained by his predecessor counsel from the Wisconsin Department of Corrections." Ex. 14 at ¶ 2.

The record contains a Wisconsin Department of Corrections health service request from Petitioner dated December 3, 2017, that was stamped as received by the health service unit ("HSU") on December 5, 2017.[3] Ex. 16 at 2. The form states, "[t]his is my 2nd slip about my left shoulder area hurting. It still hurts, & now I can't lift the arm up to 45°, & I can't sleep on that side, workout, & a bunch of other things. Ever since that flu shot it seems." *Id*. In an affidavit, Petitioner's counsel explained that Petitioner "informed me that he recently located this document while reviewing his medical records located at the HSU and that it had been misfiled under the date '5-12-2017' rather than the correct date '12-5-2017.'" Ex. 14 at ¶ 3. Petitioner's counsel adds that Petitioner was unable to locate the first health service request, or "slip," in his records. *Id*.

Almost five weeks after vaccination (December 11, 2017), Petitioner was seen in the HSU. Ex. 1 at 374. He reported a *three week* history of left shoulder pain following a flu vaccine (which would put onset in mid-November). *Id*. He stated that the "[p]ain occurred *3-4 days* [after] vaccine" and had progressively worsened before reaching a plateau. *Id*. (emphasis added). Currently he rated his pain as eight out of ten. *Id*. At best

---

[3] This form does not appear to have been included in the certified records from Waupun Correctional Institution, Ex. 1.

his pain was eight to nine out of ten, and at worst it was ten out of ten. *Id.* As the vaccine was administered, he felt 'that's [not] normal." *Id.* He had tried muscle rub and ibuprofen, which were ineffective. *Id.* He had difficulty pulling out his foot locker. *Id.* An examination was done, though the record is handwritten and difficult to read. *Id.* He was assessed with left shoulder pain, and the plan was to do an x-ray, prescribe a steroid burst, physical therapy ("PT"), and non-steroidal anti-inflammatory medications. *Id.*

On January 8, 2018, Petitioner was seen again in the HSU for "insidious onset L shoulder pain [after] influenza vaccine." Ex. 1 at 372. The record again states that the pain occurred three to four days after vaccination. *Id.* Petitioner pointed to the middle of his left deltoid, well below the subacromial bursa, and complained of shoulder pain and reduced range of motion ("ROM"). *Id.* He had not seen much benefit from steroids and still had a pain level of eight out of ten. *Id.* His left shoulder ROM was 90 degrees in abduction and 110 degrees in flexion. *Id.* He was assessed with left shoulder pain and left arm paresthesia since mid-December 2017. *Id.* He was advised to use NSAIDs, undergo a PT evaluation, and continue cortisone. *Id.*

On March 20, 2018, Petitioner underwent a PT evaluation for left shoulder pain. Ex. 1 at 309. He reported "sudden onset of L shoulder pain following a flu shot" and that his symptoms started in November 2017. *Id.* His pain ranged from two to ten out of ten. *Id.* On examination he had moderate tenderness to his left lateral shoulder. *Id.* His left shoulder ROM was 82 degrees in flexion (compared to 174 degrees on the right), 80 degrees in abduction (compared to 162 degrees on the right), 38 degrees in internal rotation (compared to 56 on the right) and 24 degrees in external rotation (compared to 90 on the right). *Id.* at 310. He was assessed with left shoulder pain and ROM limitations consistent with adhesive capsulitis. *Id.* He attended 11 additional PT sessions through July 5, 2018. *Id.* at 304-08. At discharge on July 5th, he had met all goals and his active ROM was nearly within normal limits. *Id.* at 308. He was advised to continue shoulder strengthening on his own. *Id.*

Petitioner returned to the HSU on March 29, 2018, reporting a three month history (which would put onset in late December 2017, well over 48 hours after vaccination) of left shoulder pain and paresthesia stemming from a flu vaccine. Ex. 1 at 373. His pain was at the injection site distal to the subacromial bursa, at a level of eight out of ten. *Id.* His left shoulder ROM was 90 degrees in abduction and 85 degrees in flexion. *Id.* He was assessed with adhesive capsulitis and advised to continue PT, try naproxen as well as a cortisone injection and EMG. *Id.*

On May 3, 2018, Petitioner returned to the HSU for left shoulder "pain since influenza vaccine." Ex. 1 at 369. An EMG was pending, and he received a steroid injection in his left shoulder for adhesive capsulitis and subacromial bursitis. *Id.* at 275, 369.

Nearly four months later (August 27, 2018), Petitioner submitted a request for care to the HSU. Ex. 1 at 202. He stated he had been discharged from PT, but his shoulder

pain had continued. *Id.* He was later seen on August 31, 2018, for pain from adhesive capsulitis in his left shoulder, with onset recorded as "November of 2017." *Id.* at 13. He reported a pain level of eight and described it as a sharp needling pain. *Id.* He was only able to raise his left arm to nearly 90 degrees, and reported numbness and pain. *Id.* at 14. His left shoulder had reduced ROM and pain with rolling his shoulders back. *Id.* at 15. The record states that his current pain regimen of acetaminophen, capsaicin, and naproxen was ineffective and Petitioner requested PT, but does not indicate whether PT was ordered. *Id.* at 18, 28.

On September 5, 2018, Petitioner returned to the HSU for left shoulder pain and adhesive capsulitis from a flu shot. Ex. 1 at 10. PT had helped, but since stopping it he noted stiffness and needling pain, rated at eight out of ten. *Id.* Even minimal ROM worsened the pain. *Id.* The record indicated that more PT would be scheduled. *Id.* at 11.

Three months later (December 4, 2018), Petitioner saw Dr. Cheryl Jeanpierre for left shoulder pain. Ex. 1 at 10. The record states that he was currently on the schedule for PT. *Id.*

Petitioner returned to Dr. Jeanpierre on February 18, 2019 for chronic left shoulder pain. Ex. 1 at 9-10. Dr. Jeanpierre planned to do a trial of duloxetine and reassess, but a second note the same date states she could not order that medicine due to a different medicine Petitioner was taking. *Id.* at 9.

Petitioner attended a PT evaluation for left shoulder pain on February 26, 2019. Ex. 1 at 77. He reported that the onset had been gradual, and his pain level was eight out of ten. *Id.* His left shoulder active ROM was 68 degrees in flexion (compared to 158 on the right), 68 degrees in abduction (164 on the right), ten degrees in external rotation (86 on the right), and 54 degrees in internal rotation (58 on the right). *Id.* at 78. His left shoulder had reduced strength. *Id.* The therapist assessed him as having pain limiting function and ROM and strength deficits. *Id.* at 79. He attended four additional PT sessions through March 29, 2019. *Id.* at 74-77.

On April 16, 2019, Petitioner submitted a health service request requesting care for shoulder pain since the second day after his flu shot. Ex. 1 at 174. Ten days later (April 26, 2019), he submitted another request, stating that "[s]ince the day after [his] 2017 flu shot" he had sharp needle like pain in his left shoulder. *Id.* at 172. The pain and ROM limitations persisted after two rounds of PT, and he requested to be seen. *Id.*

Petitioner had a nurse appointment in the HSU for left shoulder pain and reduced ROM on May 1, 2019. Ex. 1 at 11. He rated his pain as seven out of ten. *Id.* at 12. He had just started Duloxetine. *Id.* at 13. Petitioner was advised to continue stretches, ice, and medication. *Id.* The record adds that Petitioner "was observed to use his left arm to open the HSU gate and both doors to HSU." *Id.*

6

A week later (May 8, 2019), Petitioner saw nurse practitioner Robert Martin for "worsening pain in left shoulder approximately 2 days after receiving influenza vaccination 11/2017." Ex. 1 at 8. He described a "needle pain; like there is something pushing apart the two bones like a sharp pain" to the anterior scapula." *Id*. He had decreased ROM, and stated that naproxen/duloxetine had not helped the pain at all. Ice, Thera bands, and a TENS unit provided temporary relief. *Id*. The record noted that after the appointment he "was able to open security door with left arm without difficulty/strain and was able to hold door open with arm using posterior extension for arriving" patient. *Id*. at 9. NP Martin added that Petitioner's [s]ymptoms [do] not appear to be consistent with examination and observation of leaving HSU." *Id*. Petitioner was advised to continue naproxen and duloxetine. *Id*.

Four months later (September 12, 2019), Petitioner saw NP Martin for continued left arm pain and weakness that had been "chronic ever since receiving the flu shot in 2017." Ex. 1 at 7. Duloxetine had been ineffective for pain. *Id*. NP Martin prescribed clonidine for nerve pain and increased the dose of duloxetine. *Id*.

Petitioner had a left shoulder MRI on June 30, 2020 for "[l]eft shoulder pain, since flu vaccination." Ex. 7 at 21. The MRI showed a posterior labral tear and mild supraspinatus and infraspinatus tendinosis. *Id*. at 22.

On July 24, 2020, Petitioner saw Dr. Prapti Kuber for chronic shoulder pain "post immunization performed in 2017." Ex. 3 at 24. Dr. Kuber recommended that he see an orthopedist, and ordered a low bunk for his safety. *Id*. Petitioner continued seeking care for his left shoulder pain in 2020 and 2021. Exs. 3, 5, 7, 12, 13.

On February 25, 2021, Petitioner saw orthopedist Dr. Jonathan Stone for left shoulder pain that had been present "since he received a[n] influenza shot in November 2017." Ex. 5 at 46.[4]

### 2. Affidavits and Declarations

Petitioner filed four affidavits and declarations in support of his claim. Exs. 2, 17, 18, 19. In an affidavit signed on October 10, 2022 – nearly five years after vaccination – Petitioner states that the November 8, 2017 flu vaccine was administered in his left

---

[4] This record, and several other records filed by Petitioner, are not properly paginated. Pursuant to Vaccine Rules Supp. 10(a) and Guidelines Sec. 2 Ch. 3(C)(2), each exhibit should be independently paginated starting with page 1. Instead, Petitioner used continuous pagination, with the first page of Exhibit 5 being labeled "SALAZAR000577." Petitioner's counsel is cautioned that future exhibits that are not properly labeled and paginated may be stricken. For purposes of this ruling, I refer to the page numbers added by CM/ECF in the headers of the PDF.

7

shoulder. Ex. 17 at ¶ 3.[5] He explains that he told the vaccine administrator that his left arm is his non-dominant arm, and he has heard it is prison policy to administer vaccines to the non-dominant arm. *Id.* at ¶ 5. The vaccine was administered high on his shoulder, and when the administrator tried to pull the syringe out, "it looked and felt stuck in my shoulder before she succeeded in pulling it out with a lot more effort." *Id.* at ¶ 6. The vaccine administrator said something like "that was weird" and "that's not normal." *Id.*

By the next afternoon, Petitioner felt a throbbing pain in his shoulder. Ex. 17 at ¶ 7. He planned to do pull ups and push ups with a fellow inmate, Markice Posey, as usual during recreation time. *Id.* However, the pain prevented him from doing so or lifting any weights on that date. *Id.* That night around 6:00pm, he spoke to his then-girlfriend, Susan Hagen, by phone. *Id.* at ¶ 8. He complained to her about his left shoulder pain, which he does not usually do as he has a high pain tolerance. *Id.* She told him to see a doctor. *Id.* That night, he struggled to get up to his top bunk and doing so resulted in left shoulder pain. *Id.* at ¶ 9. He recalls writing to the HSU "within a couple of days" asking to be seen for left shoulder pain. *Id.* at ¶ 10.

In an affidavit signed October 19, 2022, close to five years after vaccination, Markice Posey explains that he received a flu vaccine on the same day as Petitioner, and witnessed Petitioner's vaccination. Ex. 18 at ¶¶ 2-3. He saw the vaccine needle get stuck in Petitioner's shoulder "in a strange way," and recalled that hours after the shot Petitioner said his arm was sore and they discussed whether he should put in a request slip to the HSU. *Id.* at ¶¶ 4-5. He recalled that he and Petitioner used to exercise during their recreation period, but that Petitioner could not do so "because of the pain in his shoulder shortly after the shot." *Id.* at ¶ 6.

Susan Hagen submitted an affidavit signed October 10, 2022, nearly five years after vaccination, stating that she spoke with Petitioner, her former boyfriend, by phone on November 9, 2017. Ex. 19 at ¶ 2. During that call, Petitioner told her that the day before (November 8th), he had received a flu vaccine in his left shoulder, and complained about left shoulder pain from the vaccination. *Id.* at ¶¶ 3-4. Because Petitioner does not usually complain about pain, she thought something was wrong and told him to see a doctor right away. *Id.* at ¶ 4.

### B. The Parties' Arguments

Petitioner argues that the affidavits of Petitioner, Mr. Posey, and Ms. Hagen demonstrate that he experienced left shoulder and arm pain within 48 hours. Petitioner's

---

[5] Petitioner also submitted an earlier affidavit, Exhibit 2, notarized January 20, 2021 (over three years after vaccination), but this affidavit largely summarizes the records rather than providing testimony on onset based on Petitioner's knowledge or recollection.

8

Motion for a Ruling on the Record, filed Nov. 9, 2022, at *13 (ECF No. 46) ("Mot."). Petitioner cites his statement that he felt throbbing pain by the afternoon of November 9, 2017, the day after vaccination, and struggled to get to his top bunk that night. Mot. at 13-14. Additionally, Petitioner asserts that his pain prevented him from doing pull ups and push ups with Mr. Posey the day after vaccination, and Mr. Posey corroborated this. *Id.* Petitioner adds that he spoke with Ms. Hagen by phone the day after vaccination and complained of shoulder pain, and that Ms. Hagen has corroborated this. *Id.* at *14. Finally, Petitioner argues that he wrote to the HSU within a couple of days asking to be seen, but the Wisconsin Department of Corrections "appears to have misplaced this request." *Id.* at *14-15. However, the health service request submitted on December 3, 2017 states that it was Petitioner's second request. *Id.* at *15.

Concerning the situs of vaccine administration, Petitioner argues that his injection was documented as occurring in the "LD," meaning left deltoid. Mot. at *15 (citing Ex. 15). He adds that his affidavit supports a finding that the vaccine was administered in his left arm. *Id.*

Respondent argues that Petitioner has not met his burden of proof and is not entitled to compensation. Respondent's Response, filed, Jan. 9, 2023, at *6-7 (ECF No. 48) ("Resp."). Contemporaneous medical records do not establish that Petitioner suffered the first manifestation of onset of his injury within 48 hours of vaccination. Resp. at *7. Rather, Respondent asserts, Petitioner's first treatment was over a month after vaccination, at which point he stated he had been experiencing shoulder pain since three or four days after vaccination – clearly placing onset outside of the 48 hour timeframe for a Table SIRVA. *Id.* Respondent adds that Petitioner relies solely on affidavits to establish onset within 48 hours. *Id.* Respondent argues that testimony offered after events is less reliable than contemporaneous medical records. *Id.* at *8.

Concerning the situs of vaccine administration, Petitioner's vaccination record does not identify in which arm the vaccine was administered, but "subsequent medical records indicate that petitioner represented that he received the flu vaccination in his left deltoid." Resp. at *1-2. Respondent does not present further arguments about the situs, and does not appear to raise this as a basis for denying compensation. *Id.* at *1-10.[6]

Petitioner replies that Respondent has not challenged the validity of Petitioner's additional documentation (Ex. 15), and does not argue that the situs of vaccination remains in dispute, and thus "Respondent has waived this 'second reason' for objecting to compensation." Petitioner's Reply in Support of Motion for a Ruling on the Record, filed

---

[6] Respondent also suggests that Petitioner has not established that he suffered the residual effects of his alleged injury for more than six months, but does not further explain his objections on this issue. Resp. at *7. It appears that there are medical records suggesting residual effects beyond six months (Ex. 1 at 13, 369), but because this was not fully briefed I make no finding on this matter.

Jan. 17, 2023, at *1 (ECF No. 49) ("Reply"). Thus, Petitioner asserts that onset is the sole remaining issue. Reply at *1-2.

Concerning onset, Petitioner again relies on the affidavit evidence of Petitioner, Mr. Posey, and Ms. Hagen. Reply at *2-3. In response to Respondent's argument that contemporaneous medical records should be given more weight than testimony, Petitioner argues that Respondent ignores the fact that he was incarcerated and thus could not immediately seek medical treatment from a provider of his choice, but needed to submit a health service request to receive medical treatment. *Id.* at *3-4. Petitioner had to do this twice before he was seen, and argues that he should not be penalized for the Wisconsin Department of Corrections misplacing his first request. *Id.* at *4. Petitioner argues that the December 11, 2017 medical visit was not as contemporaneous as Respondent claims due to delays in treatment caused by the prison, not Petitioner, and thus should not be given a presumption of accuracy "in light of other compelling evidence." *Id.* Petitioner argues that the affidavits of Petitioner, Mr. Posey, and Ms. Hagen are the type of "consistent, clear, cogent, and compelling" testimony that overcomes any slight inconsistencies in his medical record, *citing Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013). *Id.*

### C. Factual Findings

#### 1. Situs of Vaccine Administration

I find that a preponderance of the evidence supports a finding that the flu vaccine was administered in Petitioner's left arm as alleged. Although the certified records do not list the situs of vaccination, Petitioner presented for care a month after vaccination reporting left shoulder pain from the flu vaccine. Ex. 1 at 374. Thereafter, he consistently related his left shoulder pain to his flu vaccination when seeking care. Ex. 1 at 7, 8, 10. 13. 172-74, 309, 369, 372, 373; Ex. 5 at 46; Ex. 7 at 21. This evidence is supported by affidavit evidence.[7]

#### 2. Onset

Although the standard applied to resolving onset for an alleged Table SIRVA is relatively liberal, and sometimes permits a determination in a petitioner's favor in the absence of contemporaneous medical records, ultimately I must weigh the evidence in each particular case. In this case, I find that a preponderance of the evidence weighs

---

[7] I do not rely on the purported second page of Petitioner's vaccination record (Ex. 15 at 2), because it does not list his name, has a different date of vaccination, and was not included in the certified medical records provided by the institution.

*against* a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccine administration.

The first document showing that Petitioner reported shoulder pain is the December 3, 2017 HSU request form, and it states that he had been experiencing left shoulder pain "[e]ver *since [his] flu shot.*" Ex. 16 at 2 (emphasis added). However, when Petitioner was actually first seen on December 11, 2017, he reported a three week history of pain, which would put onset in *mid-November*, well beyond 48 hours, and his pain was noted to have started *"3-4 days" after* vaccination. Ex. 1 at 374 (emphasis added). Just under a month later (January 8, 2018), he again reported pain that occurred three to four days after vaccination. Ex. 1 at 372. That record also documented left arm pain and paresthesia *since mid-December 2017* – well over a month after vaccination.

At later visits, Petitioner reported pain that followed a flu shot, was related to a flu shot, or started in November 2017 (without specifying when in November). Ex. 1 at 10, 13, 209, 369. In late March 2018, he reported a three month history of shoulder pain (*id.* at 373), which would put onset in late December 2017 – well beyond 48 hours.

It was not until April 16, 2019 – over a year and five months after vaccination – that Petitioner reported pain occurring within a day or two of his 2017 flu shot. Ex. 1 at 174; see also Ex. 1 at 172 (April 26, 2019 record stating he had left shoulder pain since the day after his 2017 flu shot); Ex. 1 at 8 (May 8, 2019 record reporting left shoulder pain two days after vaccination). And while Petitioner submitted affidavit evidence suggesting onset within 48 hours of vaccination, the affidavits were signed *nearly five years* after the events in question, and do not include details concerning how the affiants were able to recall specific dates and events so long afterward.

Thus, the only evidence that would support a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination is medical record evidence from nearly *a year and a half after vaccination*, and affidavit testimony *nearly five years after vaccination* that contradicts that most contemporaneous medical records. While Petitioner argues that those records are not as contemporaneous as Respondent claims, they are nonetheless *far* more contemporaneous than the 2022 affidavit evidence or 2019 medical records. I decline to rely on later-in-time affidavit testimony that contradicts contemporaneous medical records, especially when those records provide a consistent onset time. *See Bell v. Sec'y of Health & Human Servs.*, No. 19-0952V, 2023 WL 6620363, at *6 (Fed. Cl. Spec. Mstr. July 12, 2023) (declining to rely on affidavit testimony that contradicted contemporaneous medical records concerning onset and dismissing Table SIRVA claim); *see also Mazza v. Sec'y of Health & Human Servs.*, No. 20-1340, 2023 WL 5844787 (Fed. Cl. Spec. Mstr. Aug. 10, 2023) (dismissing Table SIRVA claim where Petitioner reported symptoms beginning three days after vaccination, even though Petitioner later reported symptoms two days after vaccination); *Dworkis v. Sec'y of Health & Human Servs.*, No. 17-1722V, 2022 WL 3641706 (Fed. Cl. Spec. Mstr. July 18, 2022)

(dismissing Table SIRVA claim where Petitioner's first treatment for shoulder pain four months after vaccination indicated a three month history of shoulder pain).

## Conclusion and Scheduling Order

Because Petitioner cannot preponderantly establish that the onset of his symptoms occurred within 48 hours of vaccination, his Table SIRVA claim cannot proceed and is dismissed. However, because there is evidence that could support a viable off-Table claim for a vaccine-related injury, the parties should attempt settlement – although the matter will be promptly transferred out of SPU if they are unable to resolve the claim expeditiously.

**Petitioner shall file a joint status report stating whether the parties believe an informal resolution can be reached by no later than <u>Wednesday, March 20, 2024</u>. If the parties do not report significant progress, I anticipate transferring the case out of the SPU.**

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master